IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Computer Programming Unlimited, Inc., | Case No. 3:21 CV 2350 |
| Plaintiff, | ORDER GRANTING <u>SUMMARY JUDGMENT</u> |
| -vs- | JUDGE JACK ZOUHARY |
| Hartford Casualty Insurance Company, | |
| Defendant. | |

### INTRODUCTION

This case involves an insurance-coverage dispute over a Policy issued by Defendant Hartford Casualty Insurance to Plaintiff Computer Programing Unlimited ("CPU"). Counsel filed Joint Stipulated Facts (Doc. 12) and simultaneous briefs on coverage (Docs. 13–16). The parties agree this Court has all evidence relevant to the coverage issue (Tr.[1] at 1–2).

### BACKGROUND

CPU provides information-technology services to small businesses (Doc. 12 at 3). To do so, it must secure sufficient server space from third-party vendors (*id.* at 4). In July 2019, CPU leased two servers and contracted with Nuvolat Cloud Group ("Nuvolat") to provide cloud services for the servers (*id.*). On June 19, 2020, Nuvolat notified CPU that it was filing for bankruptcy and would be unable to continue providing services after July 15, 2020 (*id.*). In response, CPU had to contract with another third party to migrate its customer data to other servers (*id.* at 5). CPU was able to successfully transfer the client data without any disruption in service (*id.*).

---

[1] The citation "Tr." refers to the unofficial transcript of the record hearing held October 21, 2022.

CPU then sought payment from Hartford of over $218,000 allegedly related to Nuvolat's default in services (*id.* at 6). On initial review, Hartford responded that the alleged losses were not covered (*id.* at 6–7). CPU subsequently opened a formal claim, alleging it "suffer[ed] a direct physical loss of computer equipment," and asking for damages equivalent to the cost of leasing replacement servers (*id.* at 7). Hartford notified CPU that it was unclear whether physical loss or physical damage had occurred to the servers (*id.*). CPU maintained that the claim was not about the servers, but instead, about "the *loss of the use* of the servers" (*id.* at 8).

Hartford ultimately denied coverage and CPU sued in state court (*id.*). Having properly removed to this Court, Hartford now moves for Summary Judgment (Doc. 14), which is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Civil Rule 56(a).

## LEGAL STANDARD

Under Ohio law, "[a]n insurance policy is a contract whose interpretation is a matter of law." *Sauer v. Crews*, 140 Ohio St. 3d 314, 317 (2014) (citation omitted). In determining whether a provision covers a given loss, this Court examines the "plain and ordinary meaning" of the Policy's terms. *World Harvest Church v. Grange Mut. Cas. Co.*, 148 Ohio St. 3d 11, 17 (2016) (citation omitted).

CPU bears the burden of proving the Policy covers the loss. *See, e.g.*, *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 87 Ohio St. 3d 270, 273 (1999) ("One who seeks to recover on an insurance policy generally has the burden of demonstrating coverage under the policy and then proving a loss."). Absent a concrete answer to the question of whether the loss is covered, this Court must predict whether the Ohio Supreme Court would interpret direct physical loss to include the "loss of use" in this case. *See Sys. Optics, Inc. v. Twin City Fire Ins. Co.*, 2022 WL 616968, at *2 (6th Cir. 2022).

### DISCUSSION

*The Policy*

The Special Property Coverage Form states that Hartford will reimburse CPU for "direct physical loss of or physical damage to" property covered by the Policy (Doc. 12 at 8). However, "loss of use" is explicitly excluded from coverage (*id.* at 9). CPU relies on two endorsements related to the above provision.

First, the endorsement "Computers and Media" states: "We will pay for direct physical loss of or physical damage, to 'computer equipment' and the cost to research, replace or restore physically lost or physically damaged 'electronic data' and 'software'" (*id*. at 10). This endorsement extends "[d]irect physical loss or physical damage" to include "[e]lectromagnetic injury caused by: (1) Blackout or brownout; (2) Power Failure; (3) Airport security check, or radio or telephone line interference; or (4) Electromagnetic disturbance outside the "computer system" (*id.* at 11). Second, the endorsement "Technology and Software Service Providers Stretch" incorporates the terms of the first endorsement, but "stretches" the policy limits on covered losses to greater dollar amounts (*id.* at 12–13).

*Physical Loss or Damage*

The outcome of this case depends on the answer to a single question: whether notice from a supplier who is no longer willing to power servers at a future date qualifies as physical loss or damage under the Policy.

CPU advances two theories. First, when Nuvolat eventually stopped servicing the servers, the power would be shut off, and this would constitute a "direct physical loss" due to "power failure" (Doc. 13 at 7–9). Second, physical damage would also occur because "as soon as you turn off power to the servers, the electricity isn't running anymore, and if it's in the middle of doing a process, then you could lose some data and it could be corrupted and damaged" (Tr. at 15). CPU bases both theories

on the underlying argument that coverage for physical loss or damage "includes loss of use, functionality, and reliability" -- which is exactly what would have happened here but for its successful efforts to find a new provider (Doc. 15 at 2). Hartford responds that the Policy "plainly requires physical loss or physical damages to trigger [] coverage," and because no such loss or damage occurred, no coverage was triggered (Doc. 14 at 5).

CPU first cites *Ashland Hospital Corp. v. Affiliated FM Ins. Co.*, 2013 WL 4400516, (E.D. Ky. 2013) to support its loss-of-use argument. In that case, the air-conditioning equipment in a hospital data center failed. *Id.* at *1–2. The computer system overheated and crashed, leaving hospital personnel without access to vital patient information. *Id.* The insurer denied the hospital's claim because the policy only covered "direct physical loss or damage." *Id.* at *11. The district court disagreed, holding that such damage "is undeniably 'direct' and 'physical': it is 'direct' because the harm flows immediately or proximately from the heat exposure, and it is 'physical' because the harm results from physical alteration to the components themselves." *Id.* at *5. Here, no "*physical* process" damaged the servers. Rather, the precipitating event was written notice that the servers would be essentially unplugged in several weeks' time. *See Bellaire Corp. v. Am. Empire Surplus Lines Ins. Co.*, 2018-Ohio-2517, ¶ 28 (Ohio Ct. App. 2018) (noting that "costs incurred to prevent future harm are generally not covered by insurance.").

CPU next relies on *American Guarantee & Liability Ins. Co. v. Ingram Micro, Inc.*, 2000 WL 726789 (D. Ariz. 2000), where a faulty fire-alarm panel caused "all of the electronic equipment [in the company's] Data Center, including the computers and telephones" to stop working. *Id.* at 1. The insurer denied the claim because there was no physical damage to the equipment's ability to process data. *Id.* at 1–2. The district court disagreed, and found physical damage stemming from the outage:

4

> In the days following the power outage, Ingram employees determined that when the power outage occurred, all of the programming information disappeared from the random access memory. The custom configurations that existed prior to the outage were different than the default settings after the outage. So when power was restored to the matrix switch, the custom configurations remained lost. The matrix switch had to be reprogrammed with the necessary custom configurations before communications . . . could be restored.

*Id.* at *2. So in that case, there was an unexpected "loss," that is, the settings and configurations that were unexpectedly wiped out by the power outage. But that case is different from this one. Here, there was no unexpected power loss and no data "remained lost."

It is undisputed that CPU never lost any data and that CPU successfully transferred all of its client data to alternative servers before there was any interruption in service. In *Ingram Micro*, there was damage that needed to be repaired. "There is nothing to be repaired here." *B St. Grill & Bar LLC v. Cincinnati Ins. Co.*, 525 F. Supp. 3d 1008, 1015 (D. Ariz. 2021). Moreover, other courts have rejected CPU's arguments. *See, e.g.*, *Am. Online, Inc. v. St. Paul Mercury Ins. Co.*, 207 F. Supp. 2d 459, 469–70 (E.D. Va. 2002) (noting that *Ingram Micro* improperly relied on the "importance of computers" and not the definition of the word "physical"). The Sixth Circuit also recently noted that the phrase "direct physical loss" means "an 'immediate' 'tangible' 'deprivation' of property." *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401 (6th Cir. 2021). CPU's loss-of-use claim fails on all three fronts. And because the servers suffered no "tangible, material, physical alteration," this "loss of use" theory is insufficient to demonstrate a "direct physical loss or damage" under the Policy. *See S. Kitchen Nashville, LLC v. Cincinnati Ins. Co.*, 2021 WL 4320567, at *7 (M.D. Tenn. 2021).

This Court agrees that physical damage requires, at minimum, some sort of tangible damage to the covered item. Take for instance *Universal Image Productions, Inc. v. Federal Inurance Co.*, 475 F. App'x 569 (6th Cir. 2012), where the insurer denied coverage after a company's building was contaminated by mold. The company sought coverage for cleaning costs, lost income, and moving

5

expenses. *Id.* at 571. The Sixth Circuit found the denial was proper, in large part because "[a]ll remediation efforts were paid for by [the company's] landlord, and not a single piece of [] physical property was lost or damaged as a result of mold or bacterial contamination." *Id.* at 573. Thus, economic losses associated with loss of use are not necessarily covered under a direct physical loss or damage provision. While the facts may be different, the principle announced by the Sixth Circuit applies with equal force in this case. CPU seeks costs to cover the expense of migrating its data to different servers. That is, damages for the cost difference of switching to a new service provider. "These are not tangible, physical losses, but economic losses." *Id.* at 573.

A final point. In its opposition, CPU notes that the leased servers were eventually physically lost. However, CPU admitted from the outset -- even prior to this lawsuit -- that its claim is "not for the loss of the servers, it is for the loss of the use of the servers" (Doc. 12-7). After CPU migrated its data from the servers, "the servers [were] just door stops. They . . . [had] no value to CPU" (Tr. at 13). And for this reason, CPU opted not to seek "damages for the loss of the servers" (*id.* at 14).

## CONCLUSION

CPU contracted with a service provider that eventually went out of business and now attempts to turn that failed contract into an insurance claim. Sometimes a business deal goes bad. The insurance coverage at issue was not intended as a substitute for a breach of contract.

CPU has not identified any genuine issues of material fact that would preclude summary judgment. The Motion for Summary Judgment (Doc. 14) is granted. This case is dismissed.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

October 26, 2022